# United States Court of Appeals
## For the First Circuit

---

No. 12-1476

UNITED STATES OF AMERICA,

Appellee,

v.

EDDIE M. RODRÍGUEZ,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Stahl and Thompson, Circuit Judges.

---

Michael R. Hasse on brief for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney,
Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, on brief for appellee.

---

September 25, 2013

---

**STAHL, Circuit Judge**. Eddie Rodríguez was convicted by a jury in the District of Puerto Rico of several drug offenses. After a partially successful appeal of his conviction and sentence, he was resentenced by the district court on remand. He now appeals the resulting sentence, arguing that the district court failed to follow proper sentencing procedures and erroneously determined the quantity of drugs for which he was accountable. After careful consideration, we affirm.

## I.  Facts & Background

Eddie Rodríguez was found guilty of five drug-related offenses following a seven-day jury trial. This appeal arises from his resentencing after this court vacated two of those convictions and remanded the case to the district court. Because this appeal follows a conviction, to the extent that it relies upon evidence submitted to the jury, we view those facts in the light most favorable to the verdict. See United States v. Mercado, 412 F.3d 243, 245 (1st Cir. 2005). We recounted the factual and procedural history of this case in some detail in United States v. Díaz, 670 F.3d 332 (1st Cir. 2012), and thus summarize only the relevant background below, adding subsequent developments as necessary.

Rodríguez was one of forty-seven defendants named in a seven-count indictment alleging that, among other things, between 2006 and March 27, 2009, they conspired to operate a drug point in

-2-

the San Antonio Public Housing Project (commonly known as "Carioca"), in the municipality of Guayama, Puerto Rico.

As relevant to Rodríguez, the indictment alleged that the defendants knowingly conspired to possess with intent to distribute various amounts of cocaine base ("crack"), heroin, cocaine, marijuana, and Oxycodone within 1,000 feet of a school and/or public housing facility and/or playground, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860 (the "conspiracy count"), and that, aiding and abetting each other, they knowingly and intentionally possessed with intent to distribute one kilogram or more of heroin, fifty grams or more of crack, five kilograms or more of cocaine, and one thousand kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (the "substantive counts").

Following a jury verdict finding Rodríguez guilty of all five counts, the probation department prepared a presentence report (PSR) that recommended Rodríguez be held accountable for more than 4.5 kilograms of crack (corresponding to the highest base offense level, 38, under the then-current sentencing guidelines). The probation department's calculation was based upon: (1) trial testimony that, during the life of the conspiracy, the drug point sold approximately sixty grams of crack each day; and (2) the fact that Rodríguez was an active participant in the conspiracy for approximately one year. After a two-level increase because the

-3-

offense occurred within 1,000 feet of a protected location, and combined with a criminal history category of I, the probation department calculated the guideline range to be 292 to 365 months.

At the original sentencing hearing, the district court considered Rodríguez's role in the conspiracy and determined that he was accountable for 500 grams to 1.5 kilograms of crack, corresponding to a base offense level of 34. The court stated that it did not "think we should go all the way to 38," as recommended in the PSR. It also rejected the probation officer's in-court suggestion to use a base offense level of 36, corresponding to 1.6 kilograms,[1] even though "by preponderance . . . he could easily have sold 1.6 kilograms of crack cocaine," because 34 resulted in "a range that [it] can live with." With the two-level protected-location enhancement, Rodríguez's sentencing guideline range was 188 to 235 months. After noting the disparity between this calculation and the PSR, the court explained that the lower range reflected "some sort of balancing act trying to find some sort of justice" in light of Rodríguez's youth. The district court sentenced him to 188 months of imprisonment and ten years of supervised release as to each count, to be served concurrently.

---

[1] This calculation was apparently in error. The probation officer indicated that sixty grams of crack per day over nine months of participation would yield a total of 1.6 kilograms. This calculation is off by a factor of ten; the correct amount is, in fact, 16.2 kilograms.

In his initial appeal, Rodríguez challenged his conviction and sentence, raising, as relevant here, two issues: (1) whether the district court erred in calculating the quantity of drugs attributable to him for purposes of determining his sentencing guideline range; and (2) whether the district court lacked jurisdiction under the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. § 5032, for insufficient evidence that he participated in the conspiracy or committed any of the substantive drug offenses after he reached the age of majority.

Absent certain exceptions not applicable here, the FJDA prevents district courts from exercising jurisdiction over a defendant who is under the age of twenty-one when criminal proceedings are commenced for acts that occurred before he turned eighteen. Rodríguez entered the conspiracy before his eighteenth birthday, was absent from the conspiracy from May 2007 to August 2008 because he was incarcerated in a juvenile detention facility, and attained the age of majority during his incarceration. We affirmed his conviction of the conspiracy count, finding that there was sufficient evidence of post-majority participation. We also affirmed his convictions of the substantive marijuana and crack counts, but vacated his convictions of the substantive heroin and cocaine counts for lack of evidence that, after Rodríguez had reached the age of eighteen, he or his co-conspirators possessed or distributed either drug. Because the vacated counts may have

-5-

"alter[ed] the dimensions of the sentencing 'package,'" Díaz, 670 F.3d at 344 (quoting United States v. Genao-Sánchez, 525 F.3d 67, 71 (1st Cir. 2008)) (internal quotation marks omitted), we remanded his case to the district court for resentencing. Finally, in light of the remand, we did not reach Rodríguez's challenge to the district court's drug-quantity calculation.

In resentencing on remand, the district court considered Rodríguez's extensive role in the conspiracy, based upon his participation both pre- and post-majority, and determined that he could "conservatively" be held accountable for at least one year's worth of crack sales at the drug point -- which, at sixty grams per day, amounted to 21.9 kilograms. The court instead selected a "very, very conservative number" of between 150 and 500 grams of crack, which it adjusted to 280 to 840 grams of crack to reflect the quantity cut-offs in the new crack sentencing guidelines.[2] This quantity corresponded to a base offense level of 32, and, after the two-level protected-location enhancement, the sentencing guideline range was 151 to 188 months. The district court again imposed a sentence at the bottom of the range, sentencing Rodríguez to 151 months of imprisonment and ten years of supervised release

---

[2] On remand, the district court applied the revised crack sentencing guidelines promulgated pursuant to the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372. The new guidelines resulted in guideline range that was more favorable to Rodríguez.

as to each count, to be served concurrently.  This timely appeal followed.

## II.  Analysis

On appeal, Rodríguez claims that the district court failed to follow proper sentencing procedures and that it erred in multiple respects when determining the quantity of drugs for which he would be held accountable for sentencing purposes.

### A.  Procedural Error Under § 3553

Rodríguez contends that the district court committed procedural error in arriving at his sentence by failing to consider the sentencing factors set out in 18 U.S.C. § 3553(a) and by failing to give a statement of reasons for selecting a particular sentence as required by § 3553(c).  Because he did not raise these claims before the district court, our review is for plain error. See United States v. Medina-Villegas, 700 F.3d 580, 583 (1st Cir. 2012).  "Review for plain error entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (citation omitted).  A violation of § 3553's mandates will warrant reversal under plain error review only if the defendant demonstrates "a reasonable probability that, but for the error, the district court would have imposed a different, more

-7-

favorable sentence." United States v. Manqual-Garcia, 505 F.3d 1, 15 (1st Cir. 2007) (citation and internal quotation marks omitted).

Pursuant to the Sentencing Reform Act of 1984, 98 Stat. 1987, 18 U.S.C. § 3551 et seq., as modified by United States v. Booker, 543 U.S. 220 (2005), a sentencing court must "impose a sentence sufficient, but not greater than necessary," to achieve the purposes of sentencing, § 3553(a).[3] In determining the appropriate sentence, the court should consider various factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," "the kinds of sentence and the sentencing range established" by the sentencing guidelines, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a). Finally, "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence," § 3553(c), and, if the guideline range exceeds twenty-four months, "the reason for imposing a sentence at a particular point within the range," § 3553(c)(1).

---

[3] The relevant purposes are the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "afford adequate deterrence to criminal conduct"; "protect the public from further crimes of the defendant"; and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2).

This court has endorsed a "sequential determination of the guideline range, including any proposed departures, followed by the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc). Thus, the court typically should first calculate the correct guideline range, and then determine whether, after consideration of the § 3553(a) factors, a sentence above, within, or below that range will be sufficient, but not greater than necessary, in light of the sentencing goals. See United States v. Kimbrough, 552 U.S. 85, 110-11 (2007) (endorsing district court's adoption of this approach). Finally, the court should articulate in open court how consideration of these factors led it to select a particular sentence. § 3553(c); see also Rita v. United States, 551 U.S. 338, 356-57 (2007) (noting that this statement of reasons both assures the public that sentencing decisions are reasoned decisions and aids in appellate review).

Here, the district court did not explicitly address the § 3553(a) factors, nor did it succinctly provide a clear statement of reasons for imposing a sentence at a particular point in the guideline range as required by § 3553(c). And, to the extent that the court implicitly considered the § 3553(a) factors, it appears to have done so in selecting a guideline range, rather than first calculating the guideline range supported by the evidence and then

-9-

considering the § 3553(a) factors to determine the appropriate sentence above, within, or below that range. That is, after determining that the evidence supported holding Rodríguez accountable for 21.9 kilograms of crack, the district court rejected the corresponding guideline range as too high, implicitly taking into consideration several of the § 3553(a) factors, and then, with no apparent evidentiary basis, selected a drug quantity that would yield a guideline range that reflected an appropriate sentence.

The district court's failure to state explicitly that it was addressing any § 3553(a) factors or to provide any statement of reasons for selecting the particular sentence within the guideline range is somewhat troubling. However, we are somewhat more concerned about the district court's procedure for determining the appropriate guideline range. The drug-quantity finding, supported by a preponderance of the evidence, determines the base offense level.[4] If, as apparently happened here, the court believed, in light of the § 3553(a) factors, that the corresponding guideline

---

[4] We note that the drug-quantity calculation did not increase the statutory mandatory minimum or maximum sentence, as the drug quantity found by the jury on the substantive marijuana count triggered a ten-year minimum and life maximum sentence under 21 U.S.C. § 841(b)(1)(A). Therefore, judicial fact-finding does not implicate Apprendi v. New Jersey, 530 U.S. 466 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), or Alleyne v. United States, 133 S. Ct. 2151 (2013).

-10-

range was higher than necessary to achieve the sentencing goals, it could have imposed a below-guidelines sentence and articulated why it had done so.  Rodríguez did not raise this issue to the district court -- and, as it turned out, this procedure worked in his favor.[5]  If he had, there would have been error that was both clear and obvious.

Nonetheless, in this particular case, the procedure followed by the district court did not affect Rodríguez's substantial rights.  "[O]n this record, the likelihood of a different sentence on remand is an empty hope unsubstantiated by any plausible rationale.  Accordingly, there is no principled way that we can find plain error arising out of the district court's failure to effect literal compliance" with § 3553(a) and (c).  Medina-Villegas, 700 F.3d at 584; see also Manqual-Garcia, 505 F.3d at 15-16 (district court's rote recitation that it had considered relevant § 3553(a) factors, without any attempt to link them to defendant's conduct or goals of sentencing, was clear and obvious error, but reversal unwarranted where defendant did not identify specific facts showing reasonable probability of different sentence on remand).

---

[5] Although Rodríguez objects to the district court's drug-quantity calculation, an issue we address infra, he has not argued that the district court procedurally erred by reverse-engineering his guideline range.  Nor would he; the district court adopted a guideline range that shaved nearly twelve years off the low end and nearly fifteen years off the high end of the range that the court believed the evidence supported.

At various points throughout the sentencing hearings, the district court appears to have considered the nature and circumstances of the offense;[6] the history and characteristics of the defendant;[7] the need for the sentence to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence;[8] and the need to avoid unwarranted sentencing disparities.[9] After considering all of these factors, the district court determined that the guideline range supported by the evidence

---

[6] "Let's not forget that Eddie Rodríguez was not just an individual who would be a lookout or facilitator or anything like that. He was an enforcer. He used -- carried firearms. He sold, collected rent from a drug point." "He knew that this was a big time operation. That he knew. He was there. He was an enforcer for them, all that. He was a seller."

[7] "So I think that we are doing some sort of balancing act trying to find some sort of justice, or justiciable remedy of this case, which involves a very young guy . . . ." In addition, the court heard defense counsel's statement addressing various mitigating factors, including Rodríguez's conduct after release from juvenile detention, that the court should consider. The court expressly disbelieved the trial testimony of the defense witnesses with respect to Rodríguez's post-release conduct, finding it incredible. This court will not lightly discard the sentencing court's credibility determinations. See United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999).

[8] "People do horrible things in Guayama and they get away with it. . . . People get charged left and right with big time crime, including murder, like in this case, and people get dismissed. . . . [I]n Guayama crime pays, that's for sure."

[9] The court considered and rejected defense counsel's argument that Rodríguez's sentence should approximate other co-defendants' sentences, noting that the circumstances were "completely different."

was higher than necessary,[10] and settled upon a drug quantity that was between 1.2 and 3.8% of the amount that the court believed Rodríguez was "easily" responsible for. Even after making these adjustments, the court imposed a sentence at the very bottom of the reduced guideline range.

"[A] court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did." Jiménez-Beltre, 440 F.3d at 519. Here, the record demonstrates that the district court did consider -- albeit in a roundabout and implicit way -- the § 3553(a) factors that it deemed relevant and came to a reasoned determination of the appropriate sentence. There is no reasonable probability that, had the district court followed proper sentencing procedures, it would have imposed a more favorable sentence. See Mangual-Garcia, 505 F.3d at 15-16; see also Medina-Villegas, 700 F.3d at 584 ("To cinch the matter, the appellant has not identified any factors that make it likely that he would receive a different sentence on remand."). Therefore, the district court's error -- though clear and obvious -- does not warrant reversal on plain-error review.

---

[10] "I don't think we should go all the way to 38 [as it would be based on the drug quantity the court found Rodríguez actually was accountable for]. So I'm going to leave it at 34." Rejecting the probation officer's suggestion that he increase the base offense level to 36 (based upon the erroneous 1.6 kilogram rather than 16 kilogram calculation), the sentencing judge stated, "I am going to leave it at level 34, because it gives me a range I can live with. 500 to 1.5, which is almost 1.6."

## B.  Drug-Quantity Calculation

Rodríguez raises three interrelated claims with respect to the district court's drug-quantity calculation.  First, he argues that the district court failed to make an individualized determination regarding the quantity of drugs that were attributable to him, instead automatically holding him accountable for the conspiracy-wide amount.  Second, he argues that, to the extent the court made an individualized determination, that determination was in error.  Finally, he challenges the reliability of the evidence upon which the conspiracy-wide calculation was based.  We address these claims seriatim.

"[W]hen a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004).  Under the sentencing guidelines, relevant conduct that may be considered for sentencing purposes includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ."  U.S.S.G. § 1B1.3(a)(1).  The question of whether the

-14-

drug-quantity calculation was based upon on individualized determination of Rodríguez's relevant conduct is a question of law that we review de novo. United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010). If it was, we review the result for clear error. Id. We will not "upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990).

Rodríguez's first argument is a non-starter. The record plainly reflects that the district court considered Rodríguez's role in, and conduct in furtherance of, the conspiracy and made an individualized determination that he could reasonably foresee the entire amount of crack sold by the conspiracy during the time he was involved in it.[11] While it is error to automatically shift the conspiracy-wide drug quantity onto a particular defendant absent an individualized finding that the entire amount was foreseeable to that defendant, Colón-Solís, 354 F.3d at 103, the district court here did make such a finding.

Rodríguez's claim that the individualized determination was erroneous requires more analysis, but is ultimately no more

_____

[11] The court discounted the fifteen months that Rodríguez spent in the juvenile detention facility, relying only on the seven and one-half months between his release and the indictment and conservatively assuming only five and one-half months of involvement before his detention.

successful.  Rodríguez argues that the district court clearly erred in finding that all of the conspiracy's crack sales during the time of his participation in the conspiracy were foreseeable to him and within the scope of his conspiratorial agreement.  The record suggests that Rodríguez was significantly less involved with crack after he reached the age of eighteen than he had been before his detention.  We previously affirmed his conviction of the substantive crack offense on the basis of a single seizure of 150 vials of crack from a co-conspirator after Rodríguez's eighteenth birthday.  See Díaz, 670 F.3d at 343.  We assumed that the jury followed the district court's Pinkerton instruction and found that the co-conspirator's possession of crack was reasonably foreseeable to Rodríguez and was committed in furtherance of the conspiracy.  See Pinkerton v. United States, 328 U.S. 640 (1946) (conspirator may be liable for all foreseeable acts of co-conspirators in furtherance of conspiracy).  But that does not mean that all crack sold by the conspiracy can automatically be attributed to Rodríguez as relevant conduct for sentencing purposes.  Pinkerton liability is, in some cases, broader than relevant conduct.  See United States v. Laboy, 351 F.3d 578, 583 (1st Cir. 2003) ("While a conspiracy charge may encompass all acts by co-conspirators in furtherance of the conspiracy, 'relevant conduct' is limited to the foreseeable acts resulting from the defendant's particular agreement.  Thus, the scope of relevant conduct is not necessarily

-16-

the same as the scope of the entire conspiracy." (citations and internal quotation marks omitted)); see also U.S.S.G. § 1B1.3 cmt. n.2. Whether the record would support a finding that all of the crack sales, pre- and post-majority, were reasonably foreseeable to Rodríguez and were within the scope of his agreement is a close question, but one that, for two reasons, we need not resolve.

First, the parties agreed below, and Rodríguez does not dispute here, that a defendant who joined a conspiracy before the age of majority can be held accountable, for sentencing purposes, for his own and his co-conspirators' acts that occurred before he reached the age of majority once it has been shown that he ratified his participation in the conspiracy after attaining the age of majority.[12] This court has never specifically so held. In United States v. Welch, 15 F.3d 1202, 1215 (1st Cir. 1993), we considered a drug-quantity calculation that included the defendant's pre- and post-majority conduct. We vacated the sentence not because it included pre-majority conduct, but because it was based upon insufficiently reliable evidence. By implication, inclusion of the

_____

[12] In pre-sentencing briefing on this issue, Rodríguez stated that "the Court may certainly consider conduct which occurred prior to the defendant's eighteenth birthday in determining the defendant's base offense level. . . . [A] defendant who may not be properly chargeable with certain conduct because of his youth at the time the conduct occurred . . . may nonetheless retain sentencing exposure for that conduct which is deemed to be reasonably foreseeable criminal acts in furtherance of the conspiracy." Defense counsel reiterated this view at the resentencing hearing.

-17-

defendant's pre-majority conduct was permissible. Several of our sister circuits have expressly held that, once post-majority ratification has been shown, relevant conduct for sentencing purposes includes pre-majority acts of the defendant, see United States v. Flores, 572 F.3d 1254, 1269-70 (11th Cir. 2009); United States v. Gibbs, 182 F.3d 408, 442 (6th Cir. 1999), and his co-conspirators, see United States v. Sparks, 309 F. App'x 713, 717 (4th Cir. 2009) (unpublished); United States v. Thomas, 114 F.3d 228, 267 (D.C. Cir. 1997). However, in light of Rodríguez's explicit waiver, and in the absence of briefing by the parties, we need not reach the question and assume, without deciding, that the district court properly considered these acts.

When considering Rodríguez's pre-majority conduct, the record supports the finding that all crack sales during that period were within the scope of his agreement and reasonably foreseeable to him. The trial testimony indicated that, before his incarceration, he occupied many roles in the drug point: He served as a runner "in charge of" the crack, bringing packages of crack to the sellers, replenishing their supplies when they ran out, and collecting the proceeds from the sales. He served as a seller of crack on occasion. He served as a triggerman, and would go "on a mission" to shoot members of rival organizations. On these facts, the district court did not clearly err in finding that, pre-majority, the scope of Rodríguez's conspiratorial agreement

encompassed all crack sales at the drug point and that all such sales were reasonably foreseeable to him. Even if the evidence does not support the same conclusion with respect to his post-majority participation, his pre-majority participation alone results in the same base offense level (38) that would result from combining the pre- and post-majority amounts.[13]

Second, as noted above, the district court did not ultimately hold him accountable for the entire conspiratorial amount. After finding that he could "easily" be held accountable for 21.9 kilograms of crack, the court held him accountable for only 280 to 840 grams -- less than nine percent of the pre-majority conspiracy-wide amount. There is simply no way to read the record in this case and conclude that this smaller quantity was not within the scope of Rodríguez's agreement and reasonably foreseeable to him. Moreover, at the first sentencing hearing, Rodríguez, through counsel, conceded that a quantity of between 500 grams and 1.5 kilograms was fair. The district court's individualized drug-quantity finding was not affected by clear error.

We turn now to Rodríguez's final argument. He contends that the district court's drug-quantity calculation was not

---

[13] Assuming that the drug point sold sixty grams of crack per day (an assumption that Rodríguez disputes, and an argument that we address infra), the district court's conservative estimate of five and one-half months of pre-detention involvement yields accountability for more than ten kilograms of crack, well above the 4.5-kilogram trigger for the highest base offense level.

supported by reliable evidence in the record. "Where . . . the amount [of drugs] seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.5. "When it is impossible or impractical to obtain an exact drug quantity for sentencing purposes, a reasoned estimate will suffice." Laboy, 351 F.3d at 584 (citation and internal quotation marks omitted). The drug-quantity finding need only be based upon a preponderance of the evidence. Cintrón-Echautegui, 604 F.3d at 6. We review the district court's drug-quantity determination for clear error. United States v. Rivera-Maldonado, 194 F3.d 224, 228 n.2 (1st Cir. 1999).

In making the drug-quantity determination, the district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); see also Cintrón-Echautegui, 604 F.3d at 6 ("[Sentencing court] may rely upon virtually any dependable information . . . , [including] information that has never been subjected to cross-examination . . . [and] information contained in a presentence report." (citations and internal quotation marks omitted)). We have frequently recognized that the district court enjoys broad discretion in determining whether given evidence is sufficiently

reliable for sentencing purposes, and we review these decisions only for abuse of discretion. United States v. Mills, 710 F.3d 5, 16 (1st Cir. 2013).

The district court determined the conspiracy-wide drug quantity during the time of Rodríguez's participation based upon estimated daily sales. "Extrapolation is a common and permissible way of attributing drugs to a defendant." United States v. Marquez, 699 F.3d 556, 561 (1st Cir. 2012). We have upheld this method where the extrapolation is "based on a known or readily calculable number of transactions involving clearly established or conservatively estimated quantities." Id. If, however, the estimates "rest[] too significantly on unreliable inferences," id. at 562 (citation and internal quotation marks omitted)(citing cases), reversal may be warranted.

Here, based upon trial testimony, the district court estimated that the conspiracy sold sixty grams of crack each day at the Carioca drug point. A cooperating co-defendant testified that the drug point operated in three daily shifts: a morning shift from 6:00 a.m. to 3:00 p.m., an afternoon shift from 3:00 p.m. to midnight, and a night shift from midnight to 6:00 a.m. He stated that the drug point generally sold over 200 vials of crack during the morning shift, a similar amount during the afternoon shift, and between 150 and 200 vials during the night shift. He also stated that, during the first several days of the month, it could sell

-21-

over 300 or 400 vials per shift.  A cooperating witness stated that the drug point sold eight to nine packages of twenty-five capsules of crack (200 to 225 capsules) during an average weekday shift and sixteen to eighteen packages of twenty-five capsules (400 to 450 capsules) during an average weekend shift.  An expert witness testified that each vial or capsule weighed approximately 0.1 grams.  The court adopted a conservative estimate of 200 0.1-gram vials or capsules per shift and multiplied by three daily shifts to arrive at an estimate of sixty grams per day.  The court then, using a conservative estimate of the duration of Rodríguez's participation in the conspiracy, multiplied the daily amount by 365 days to determine his total attributable amount, 21.9 kilograms.  Finally, notwithstanding the determination that at least 21.9 kilograms of crack sales were within the scope of his conspiratorial agreement and were foreseeable to him, the court held him accountable for less than five percent of that amount.

The court did not abuse its discretion in relying on the unrebutted trial testimony, nor did it clearly err in making its quantity determination.  The court used conservative figures in every step of the calculation, and easily could have arrived at a far larger quantity.  We have often upheld drug-quantity findings, even if imprecise, if they were based upon conservative estimates or favorable assumptions.  See Cintrón-Echautegui, 604 F.3d at 7 (upholding drug-quantity determination derived from plausible

-22-

extrapolations and favorable assumptions); <u>United States</u> v. <u>Correa-Alicea</u>, 585 F.3d 484, 491 and n.4 (1st Cir. 2009) (upholding inexact determination of drug quantity where it was based on reasonable, conservative estimate with sufficiently reliable record support); <u>Laboy</u>, 351 F.3d at 584 (same).  We do so again today.

## III.  Conclusion

For the foregoing reasons, we <u>affirm</u> Rodríguez's sentence.