# United States Court of Appeals
## For the First Circuit

Nos. 24-1881, 24-1882

UNITED STATES,

Appellee,

v.

MARCUS MELLO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Kayatta, Circuit Judges.

Marie Theriault for appellant.

Brian S. Kleinbord, Assistant United States Attorney, with
whom Craig M. Wolff, Acting United States Attorney, was on brief,
for appellee.

January 7, 2026

HOWARD, **Circuit Judge**.  In May 2021, Marcus Mello was charged with several drug-related offenses, in violation of 21 U.S.C. § 841(a)(1), and the possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  After failing to appear for trial, he was also charged with violating 18 U.S.C. § 3146(a)(1).  Mello pleaded guilty to all charges.  The district court calculated his aggregate incarcerative sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") to be 228 months to 270 months but varied below that range and selected a sentence of 181 months' imprisonment.  Mello appeals his sentence on both procedural and substantive grounds.  We affirm.

## I. Background

As this appeal follows Mello's guilty plea, we draw the facts from the presentence investigation report ("PSR") and the sentencing record.  United States v. Diaz-Serrano, 77 F.4th 41, 44 (1st Cir. 2023).

## A. Drug-Offense Conduct

Mello's drug-offense conduct stems from his distribution of purported oxycodone pills containing fentanyl that he obtained from a supplier known as "Chop."  Mello made one such sale of purported "percs" -- referring to Percocet, a brand name for a prescription painkiller that contains oxycodone -- to customer "A.K." on May 8, 2020.  Earlier that day, A.K. texted Mello, asking

- 2 -

whether she could "get 12 today" and, after Mello confirmed a few hours later that he "just got em," arranged to meet with him in South Portland, Maine. A.K.'s friend "C.C." drove with her to meet with Mello, and the two women used some of the pills purchased.

Shortly after A.K.'s meeting with Mello, law enforcement officers responded to a report of an unconscious female in a car parked at a gas station in Kennebunk, Maine. The officers found C.C. conscious but lethargic in the driver's seat of the vehicle. A.K. was unresponsive in the passenger seat and was soon pronounced deceased. The Kennebunk Medical Examiner's Office issued a report finding that A.K. died from acute toxicity from several substances, including fentanyl. In performing its examination, the office found a plastic bag of ten blue pills in A.K.'s possession. The pills were tested and determined to contain fentanyl.

The day after A.K.'s death, C.C. messaged Mello to ask what was in the pills he sold A.K. and told him that A.K. had "died after doing 1 of your pills." After this conversation, Mello continued to sell "percs," including to a confidential informant ("CI") working with law enforcement. During a monitored call with the CI on July 15, 2020, Mello stated that he was out of cocaine but had "percs" for sale. The CI subsequently purchased eight blue pills from Mello. Law enforcement tested one of the pills

- 3 -

purchased, finding that it weighed 0.113 grams and contained fentanyl.

Two days later, Mello was arrested. At the time of his arrest, he was wearing a backpack and had a cell phone in his pocket. The phone was seized, and a search of the backpack resulted in the seizure of $6,354 in cash, a loaded handgun, a small amount of marijuana,[1] ten white pills in a clear baggie, and 417 blue pills marked "M 30" divided into plastic baggies. Laboratory results revealed that the 417 blue pills weighed approximately 45.6 grams in total (approximately 0.10927 grams per pill). Twenty-eight blue pills were randomly selected for testing and were determined to contain fentanyl. One of the ten white pills was also tested. It weighed approximately 0.38 grams and was found to be oxycodone.

Mello's phone was searched pursuant to a federal search warrant. This search led to the discovery of WhatsApp messages between Chop and Mello, spanning from March 2020 to July 2020. In these communications, Mello and Chop discussed the shipment of "percs" to Mello's address, as well as Mello's successful sale of the pills. On several occasions, the pair also made references to "stick[s]," a slang term for fentanyl. The messages included

---

[1] The marijuana found in Mello's possession was not considered by the district court when calculating the total drug quantity attributable to Mello for sentencing purposes.

photographs of FedEx tracking information, establishing that packages of purported oxycodone were delivered to Mello's residence on multiple dates between April 2020 and July 2020.

Relevant here, Chop messaged Mello in early May 2020 that he had "like 3k" pills coming Mello's way and shared a FedEx tracking receipt showing shipment to Mello's residence in Maine.[2] On May 8 -- around the same time that Mello had messaged A.K. that he "just got" the pills she requested -- Mello confirmed that he received the package from Chop. Chop asked Mello how many pills he "could push today," to which Mello responded that he could "get off 200 rn like I got someone waiting" and that he had other "small plays" as well. Two weeks later, Chop messaged Mello that he had "another 3k comin tomorrow" and sent the tracking receipt. Mello confirmed receipt of the package on May 21, 2020. The two discussed shipment of a third package of "perks" in June 2020. After Mello received the package on June 23, 2020, he sent Chop a picture of the large bag of blue pills that he had received. Mello counted the pills and sent Chop a picture of the pills organized into smaller plastic baggies, stating that he counted "5k an some lik broken bits at the bottom of bag."

---

[2] The messages between Mello and Chop have been reproduced as they appear in the record, without correction of any grammatical or spelling errors except where indicated.

- 5 -

In July 2020, a few days before Mello sold the CI pills containing fentanyl and was ultimately arrested, Chop sent a message to Mello stating, "I don't wonna rush yu but how is everything moving?  Fast or slow[?]"  Mello replied, "The perc kind slowed down cause yk all these deaths an shit[.]"  He continued, "I'm trying to find more plays just slow cause no one wanna die[.]"

## B. Trial and Failure to Appear

In May 2021, Mello was charged in a superseding indictment with: distribution of fentanyl in violation of 21 U.S.C. § 841(a)(1) based on his sale to A.K. on May 8, 2020 (Count One); possession with intent to distribute 40 grams or more of a mixture or substance containing fentanyl in violation of 21 U.S.C. § 841(a)(1) based on the 417 blue pills seized at the time of his arrest (Count Two); and possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three).  In November 2020, he was released on bail directly to an inpatient substance use disorder treatment program.  Mello remained there until he transitioned to a sober living house on the facility's campus in October 2021.

A jury trial was scheduled for October 16, 2023.  When Mello failed to appear on that date, his counsel represented to the court that Mello was running late.  But when an hour passed and Mello had still not arrived, that story changed, and defense

counsel stated that Mello intended to plead guilty but could not make it to court that day. At the government's behest, a warrant was issued for Mello's arrest. The court dismissed the jury with instructions to return the following day. When Mello again failed to show, he was named in a one count indictment charging him with failure to appear in violation of 18 U.S.C. § 3146.

Law enforcement agents eventually located Mello at a South Portland residence on November 3, 2023. Upon the agents' arrival, Mello locked himself in the bathroom of the spare bedroom until he was persuaded to surrender. During a search of the bathroom, agents found a small plastic baggie with white powder. Similar baggies with white powder were found in a shoebox in the guest room and in the pocket of Mello's sweatshirt. Several months after his arrest, Mello entered a guilty plea to the three charges in the superseding indictment and to the subsequent charge of failure to appear.

### C. Sentencing

Prior to sentencing, the Probation Office prepared the PSR with the suggested Guidelines calculation. Pursuant to U.S.S.G. §3D1.2 and §2J1.6, Mello's two drug counts and failure-to-appear count were grouped together ("Count Group One"). Mello's 18 U.S.C. § 924(c) count, which carries a statutory minimum sentence of five years that must run consecutively to any other term of imprisonment, was not grouped with the other counts. In

calculating the offense level assigned to Count Group One, the Probation Office used the highest offense level among the three counts -- in this case, the offense level for Count One, distribution of fentanyl. The base offense level was determined by calculating the total drug weight, in kilograms of converted drug weight ("CDW"), attributable to Mello. The Probation Office attributed 3,022.96 kg[3] of CDW to Mello based on (1) the 6,000 fake oxycodone pills containing fentanyl he received in May 2020 (amounting to 1,635 kg of CDW)[4]; (2) the 5,000 fake oxycodone pills containing fentanyl he received in June 2020 (amounting to 1,362.50 kg of CDW); and (3) the ten oxycodone pills seized when Mello was arrested (amounting to 25.46 kg of CDW).[5]

The Probation Office also recommended increasing Mello's offense level pursuant to U.S.S.G. §3C1.1 for obstruction of

---

[3] While the PSR provided a chart explaining its 3,022.96 kg of CDW computation, a later section of the report listed the total CDW attributable to Mello to be 3,132.96 kg. The district court pointed out this discrepancy at a pre-sentencing conference and, at a later proceeding, the Probation Office confirmed that the correct amount was 3,022.96 kg as presented in the PSR's chart.

[4] One gram of fentanyl is equivalent to 2.5 kg of CDW. U.S. Sent'g Guideline Manual §2D1.1 cmt. n.8(D) (U.S. Sent'g Comm'm 2023). This conversion ratio was multiplied by the estimated average pill weight (0.109 grams per pill) to determine the CDW for the fentanyl pills.

[5] One gram of oxycodone is equivalent to 6.7 kg of CDW. U.S.S.G. §2D1.1 cmt. n.8(D). This conversion ratio was multiplied by the estimated average pill weight (0.38 grams per pill) to determine the CDW for the white oxycodone pills.

justice based on Mello's failure to appear for trial, bringing his total offense level to 34. Combined with a criminal history category of II due to several prior juvenile adjudications (including criminal mischief, criminal trespass, and violation of probation), the Guidelines sentencing range ("GSR") for Count Group One was 168 months to 210 months' imprisonment. Given that Mello was subject to a mandatory 60-month consecutive sentence on his § 924(c) count, the aggregate sentencing range was 228 months to 270 months.

As relevant to this appeal, Mello challenged the PSR's recommended Guidelines calculation on several fronts: (1) the drug quantity calculation, (2) his entitlement to a downward departure based on age, (3) the inclusion of his juvenile adjudications in determining his criminal history score, and (4) the denial of a reduction for acceptance of responsibility. The district court rejected each of these challenges.

First, rejecting Mello's argument that the drug quantity calculation was erroneous because some of the 11,000 pills may not have contained fentanyl, the court found that Mello "produced no evidence that any of this is true in this case." In the absence of any evidence to the contrary, the court noted, to "change the probation office's drug assessment[, the court] would be required to speculate as to the drug quantity." The court concluded that, "based on the record before [it], there[] [was] no basis for [the

- 9 -

court] to speculate." Relatedly, the court agreed with Mello that, if he had held some of the pills for his personal use, the total drug-quantity could be lower than the amount calculated in the PSR. But the court stated that it did not find "that the defendant was using either opiates or fentanyl from May 2020 through July 2020."

Second, the district court agreed with the government that a downward departure due to Mello's age was not appropriate because Mello's age was "not something that is presented in the unusual degree or distinguishes [this case] from the typical case." The court noted that it would "consider [Mello's] age in evaluating what the appropriate sentence should be under [18 U.S.C. § ]3553(a)" but would not depart from the Guidelines.

Third, the court addressed Mello's arguments about the scoring of his juvenile record, rejecting Mello's claim that the absence of a right to a jury trial in juvenile proceedings required that such adjudications not be considered in fashioning an appropriate sentence. The court also reasoned that, given the seriousness of Mello's juvenile offenses, a criminal history category of II did not overrepresent Mello's "past criminal history and certainly d[id] not overrepresent his likelihood of recidivism."

Finally, the court rejected Mello's argument that he was entitled to a downward adjustment for acceptance of

responsibility. The district court explained that an enhancement for obstruction of justice was proper because Mello willingly absconded prior to trial and, when such an enhancement is appropriate, an acceptance-of-responsibility credit should only be awarded in an "extraordinary case," of which this case was not one.

The district court therefore adopted the GSR calculated by the Probation Office. In selecting an appropriate sentence, the court stated that it had considered the sentencing factors set forth in 18 U.S.C. § 3553(a). The court noted that Mello had suffered emotional trauma and abuse as a child, which led to him "receiving mental health treatment and sustaining or incurring mental health issues throughout the rest of his life." It considered that Mello suffered from a variety of mental health diagnoses and had substance abuse issues. But the court stated that it must also consider the nature and circumstances of the offense. In that regard, the court found it significant that Mello continued to sell fentanyl even after he found out that the pills that he had sold to A.K. led to her death, and that he was in possession of a loaded firearm when arrested. The court further explained that a significant sentence of imprisonment was necessary as deterrence given that many in the local drug community knew that a sale by Mello resulted in a death. Ultimately, the court imposed a sentence of 115 months' imprisonment on Counts One

and Two to be served concurrently with each other and six months for the failure-to-appear conviction to be served consecutively. Additionally, Mello was sentenced to a consecutive term of 60 months for the Count Three conviction. The total term of imprisonment was 181 months, which was 47 months below the low-end of the aggregate GSR determined by the court at sentencing.

This appeal followed.

## II. Discussion

On appeal, Mello asserts that his sentence is both procedurally and substantively unreasonable. We review preserved claims of sentencing error for abuse of discretion. United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016). This is a two-step process that begins with review of the claims of procedural error. Gall v. United States, 552 U.S. 38, 51 (2007). In doing so, "we afford de novo review to the sentencing court's interpretation and application of the [S]entencing [G]uidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015).

If no procedural error is found, "we then consider the substantive reasonableness of the sentence under an abuse of discretion rubric." United States v. Melendez-Hiraldo, 82 F.4th 48, 53 (1st Cir. 2023). The guiding principle for our substantive review is that "[t]here is no one reasonable sentence in any given

case but, rather, a universe of reasonable sentencing outcomes." United States v. Flores-Nater, 62 F.4th 652, 655 (1st Cir. 2023) (alteration in original) (quoting United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011)).  A sentence falls within this universe if it bears "the hallmarks of a substantively reasonable sentence: a plausible sentencing rationale and a defensible result."  Id. (internal quotation marks omitted) (quoting United States v. Díaz-Lugo, 963 F.3d 145, 157 (1st Cir. 2020)).

## A. Procedural Soundness

Mello lodges a litany of challenges to the procedural reasonableness of his sentence.  First, he argues that the district court erroneously determined the quantity of drugs for which he was responsible.  Second, he maintains that consideration of his juvenile offenses overstated his criminal history.  Third, Mello contends that the district court erred in including the obstruction-of-justice enhancement and denying an acceptance-of-responsibility adjustment.  Finally, he disputes the court's refusal to grant him a downward departure from the guideline range based on his age, mental health conditions, and/or overrepresentation of his criminal history score.[6]  We address each challenge in turn.

---

[6] Effective November 1, 2025, the U.S. Sentencing Commission revised the Guidelines to remove most departure provisions, including the ones at issue here.  See Sentencing Guidelines for

- 13 -

## 1. Drug Quantity

The parade of procedural errors began, so Mello says, with the district court's calculation of his base offense level. Mello contends that the court's finding that the total CDW was over 3,000 kg -- resulting in a base offense level of 32 -- was a clear error given the lack of reliable evidence establishing Mello's possession of 11,000 pills containing fentanyl and the court's refusal to account for Mello's personal use of drugs.

Our review of Mello's challenge is constrained by the substantial leeway afforded to district courts when calculating drug quantity. The sentencing court need only determine drug quantity by a preponderance of the evidence. United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010). Moreover, our cases do not demand "mathematical precision . . . [but rather] a 'reasonable approximation of the weight of the controlled substance(s) for which the defendant should be held responsible.'" United States v. Dunston, 851 F.3d 91, 101 (1st Cir. 2017) (quoting United States v. Demers, 842 F.3d 8, 12 (1st Cir. 2016)). We review this factual finding for clear error and ask not "whether

United States Courts, 90 Fed. Reg. 19798, 19855-56 (May 9, 2025) ("In the years since [United States v. Booker, 543 U.S. 220 (2005),] the frequency of departures has steadily declined with courts relying to a greater extent on variances in a manner consistent with the statutory requirements in [S]ection 3553(a)."). However, we still consider Mello's claim of error, as we apply the Guidelines in effect at the time of Mello's sentence. See United States v. Hernández, 964 F.3d 95, 101 (1st Cir. 2020).

there is any view of the evidence that might undercut the district court's finding," but rather "whether there is any evidence in the record to support the finding." United States v. Rodriguez, 115 F.4th 24, 50 (1st Cir. 2024) (quoting United States v. Kinsella, 622 F.3d 75, 86 (1st Cir. 2010)). Consequently, we will not disturb the district court's drug quantity calculation "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." United States v. Rodriguez, 731 F.3d 20, 28 (1st Cir. 2013) (citing Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

Guided by this framework, we first reject Mello's claim that the evidence relied on by the district court lacked any indicia of reliability. As we have often emphasized, the sentencing court "enjoys broad discretion in determining whether given evidence is sufficiently reliable for sentencing purposes." Rodriguez, 731 F.3d at 31; see Cintrón-Echautegui, 604 F.3d at 6 ("[T]he [sentencing] court may rely upon 'virtually any dependable information' . . . [including] information contained in a presentence report." (citations omitted) (quoting United States v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990))); U.S.S.G. §6A1.3(a). Here, the court adopted the PSR's calculation that Mello possessed 11,000 purported oxycodone pills based on WhatsApp photographs, FedEx receipts, and pill counts described in messages exchanged by Mello and Chop. Besides his own say-so, Mello provides no

- 15 -

explanation for why the district court should have concluded that the WhatsApp messages and their attachments were unreliable. He does not point to any evidence that contradicts the pill counts described by him and Chop, nor does he present any argument to suggest that either of them inaccurately counted the pills. Without more, we see no reason to conclude that the district court's reliability determination was unfounded. See United States v. Bernier, 660 F.3d 543, 546 (1st Cir. 2011) (rejecting reliability challenge to co-conspirator's testimony about drug quantity because the district court was better suited to evaluate credibility and "the defendant d[id] not identify any specific contradiction or implausibility in [the] testimony").

This brings us to Mello's related contention that, even if the messages constitute competent evidence, it is possible that some of the 11,000 pills referenced in the messages did not contain fentanyl. Mello hinges this argument on the fact that the majority of the 11,000 pills attributed to him were never seized or tested. But this purported lack of direct evidence does not lead to the conclusion that the court's calculation was erroneous. "[I]n the absence of direct evidence of the total quantity of drugs, the court may rely on a reasonable estimate of the total quantity." Rodriguez, 115 F.4th at 50. "In making such a reasoned estimate, the court is entitled to draw reasonable inferences from information contained in the sentencing record."

Cintrón-Echautegui, 604 F.3d at 7. Often, this method of calculation rests on testimony from co-conspirators describing the average number of sales within a given time period and the number of pills per sale. See, e.g., Rodriguez, 731 F.3d at 31 (explaining that sentencing court may calculate drug quantity "based on a known or readily calculable number of transactions involving clearly established or conservatively estimated quantities" (quoting United States v. Marquez, 699 F.3d 556, 561 (1st Cir. 2012))); United States v. Platte, 577 F.3d 387, 390, 393-94 (1st Cir. 2009) (affirming total drug estimate derived from quantity average of drug purchases over a given period testified to by witness). Here, however, the district court did not have to wade through testimony describing the recollection of past sales because Mello's own statements over WhatsApp presented the Court with real-time pill counts and discussions of the distribution of those pills. The messages included tracking receipts for two separate shipments of "3k" sent from Chop to Mello in May, photos of the "5k" pills that Mello received in June, and discussions about the quantities of "perks" that Mello had bagged and sold.

Furthermore, the district court's conclusion that all of the 11,000 pills contained fentanyl was reasonable. Mello confirmed receipt of the first May 2020 shipment from Chop on May 8, texted A.K. minutes later that he received the pills, and then later that night, sold A.K. twelve blue pills that were later

found to contain fentanyl. Similar blue pills were sent to Mello in June, sold by Mello to the CI in July, and then seized from Mello when he was subsequently arrested. Random samples from the pills sold to the CI and from those seized at Mello's arrest all revealed that the pills contained fentanyl. The logical inference from this evidence is that the seized pills came from the contemporaneous shipments that Mello and Chop discussed. It was therefore not an error for the district court to use the average drug weight per capsule of the tested pills to derive the total drug weight for the 11,000 pills. See Cintrón-Echautegui, 604 F.3d at 7 (holding district court "plausibl[y] extrapolat[ed]" calculation from "the average drug weight per capsule suggested by the scientific evidence and the average drug sales per shift suggested by the cooperating witness"); United States v. Hilton, 894 F.2d 485, 486, 488 (1st Cir. 1990) (concluding that court reliably used drug weight of seized package to calculate total drug weight of twenty-one similar packages observed in defendant's possession but that were never seized or tested).

In aid of his attack on the circumstantial nature of the evidence, Mello also points to cases in which we have approved of a district court's conservative estimate when calculating a total drug quantity. See, e.g., Dunston, 851 F.3d at 104 ("We have consistently upheld a sentencing court's use of reasonable estimates in assessing drug quantity, and that praxis has

particular appeal when -- as in this case -- the sentencing court, in fashioning its estimate, has taken a conservative approach." (citations omitted)); Platte, 577 F.3d at 393 ("[I]mprecision in the available evidence suggests that a sentencing court should make conservative estimates based on the totality of the evidence."). But Mello skates over a crucial distinction between those cases and this one. The need for such caution in estimates often arises where there is conflicting testimony between co-conspirators. See Bernier, 660 F.3d at 547 ("Given the ranges in the testimony concerning the frequency and volume of the drug exchanges, the district court wisely . . . used throughout conservative estimates of the number of interactions and low-end estimates of volume."); Platte, 577 F.3d at 393 (explaining how "the court was careful to pick and choose" among the testimony of co-conspirator that relayed "differing estimates of drug quantities" and "took the lower end of most of the estimates upon which it relied"). But here, the district court was not provided with conflicting estimates of the drug weight or quantity. To accept Mello's argument, the court would have been required to pick an arbitrary number of pills to exclude in attempt to lower the CDW below 3,000 kg.

Moreover, the PSR's drug quantity methodology was reasonable in light of the record. Evidence suggested that Mello sold drugs prior to May, that he had sold other drugs, such as

cocaine, and that he possessed several baggies of white powder at the time of his second arrest. Despite these suggestions of a larger universe of drugs in Mello's possession, the 11,000-fentanyl pill count included in the drug weight calculation stemmed solely from the pill counts referenced in Mello's messages between May and July -- the period in which there was direct evidence that Mello had sold fentanyl. The pills sold to A.K. and the CI, and the 417 seized at Mello's arrest were not separately included in the drug quantity determination, thus avoiding any potential double counting. Moreover, in estimating the weight of the individual pills, the court used the average weight of the pills seized, even though there was at least some evidence that the weight of the pills could have been higher, given the higher weight of the pill sold to the CI. We therefore cannot conclude that the calculated drug quantity, supported by this evidence, was clearly erroneous.[7]

Finally, Mello maintains that the district court erred in failing to account for his personal use of drugs and to decrease the total drug weight accordingly. See United States v. Pinkham,

_____

[7] At times in his briefing, Mello cites to his belief that the fentanyl pills were oxycodone in order to suggest that the drug weight calculation was incorrect. But accepting this belief hurts rather helps Mello's cause. According to U.S.S.G. §2D1.1. cmt. n.8(D), oxycodone has a significantly higher drug weight conversion rate than fentanyl. The assumption that all of the pills contained a fentanyl mixture, instead of being oxycodone, therefore resulted -- to Mello's benefit -- in a lower total CDW.

896 F.3d 133, 138 (1st Cir. 2018) (explaining how other circuits have held "that drugs obtained for personal consumption should be excluded from the drug-quantity calculus"). He asserts that there is ample evidence that either the white oxycodone pills seized at the time of his arrest or some portion of the fentanyl pills should be attributed to his personal use. This assertion is not based on any evidence that he ever used those pills specifically, but rather on Mello's long history of drug abuse.

Considering first the fentanyl pills, we spy no error in the court's finding that the pills were not for Mello's personal use. As Mello acknowledges, his own admissions to the Probation Office prior to sentencing supports the finding that he stopped using opiates in March 2020. Additionally, the amount of fentanyl in Mello's possession and the evidence that the pills were divided into several packages suggest that the fentanyl pills were intended for distribution instead of personal use. Cf. United States v. Concepcion-Guliam, 62 F.4th 26, 34 (1st Cir. 2023) ("[T]he jury reasonably could have inferred that the fentanyl -- given the quantity found -- was not intended for personal use but, rather, for distribution.").

As to the white oxycodone pills, Mello never raised the possibility that these pills were for his personal use in his objections to the PSR. Nor did he do so in his sentencing

memorandum to the district court.[8]  As this argument is raised for the first time on appeal, we review the inclusion of the oxycodone pills in the drug quantity for plain error.  See Pinkham, 896 F.3d at 136-37.  Mello's argument falters under this more onerous standard.  While the number of oxycodone pills may not have been large enough by itself to suggest an intent to distribute, we cannot conclude that the court plainly erred in finding a lack of personal use when these pills were also packaged in a clear plastic baggie and when Mello explicitly disavowed use of opiates during the relevant time period.[9]

## 2. Criminal History

Mello also submits that his criminal history score was overstated due to the district court's inclusion of his two prior juvenile adjudications.  It is undisputed that "[t]he Guidelines specifically provide for certain juvenile adjudications to be considered in evaluating the defendant's criminal history." United States v. Tavares, 705 F.3d 4, 31 (1st Cir. 2013) (quoting

---

[8] It was Mello's position below that he believed the white pills were not oxycodone at all, but rather ibuprofen.

[9] Mello argues that the district court procedurally erred in finding that he acted with "willful blindness or conscious avoidance" of knowledge that the 11,000 pills contained fentanyl. But the district court did make such a finding.  While the PSR listed several facts that led the Probation Office to conclude that Mello acted with willful blindness, this conclusion was never reiterated by the district court nor did it have any impact in the district court's ultimate drug quantity determination.

United States v. Gonzalez-Arimont, 268 F.3d 8, 14 (1st Cir. 2001)). Indeed, Mello raises no argument that his juvenile offenses do not fall within the realm of adjudications contemplated by the Guidelines. Instead, he attempts to sketch a constitutional challenge to the scoring of juvenile adjudications broadly.

Mello maintains that the district court should not have assigned any criminal history points based on his juvenile adjudications because the right to a jury trial was not available in those proceedings. Citing our decision in United States v. Unger, 915 F.2d 759 (1st Cir. 1990), Mello casts nonjury juvenile adjudications as akin to uncounseled prior convictions, the latter of which may not be included in criminal history scoring when obtained in violation of the Sixth Amendment. See id. at 761 (assessing constitutionality of prior uncounseled juvenile adjudications for purposes of criminal history scoring); see also Burgett v. Texas, 389 U.S. 109, 114-15 (1967) (explaining that conviction obtained in violation of Sixth Amendment right to counsel may not be used "either to support guilt or enhance punishment for another offense"); U.S.S.G. §4A1.2 cmt. n.6. But Mello's juvenile adjudications do not fit the mold of a "constitutionally infirm" conviction that may not weigh on the sentence of a later offense. See Unger, 915 F.2d at 761. To establish the ineligibility of a prior conviction at sentencing, a defendant first must demonstrate "that he was entitled" to the

relevant constitutional protection in the prior conviction. Id. at 761 (explaining that the defendant must show, among other things, "that he was entitled to representation at the sentencing phase of the juvenile adjudication" and that he did not waive that right); see also United States v. Ponzo, 853 F.3d 558, 588 (1st Cir. 2017) (explaining that when the government establishes the existence of a prior conviction, the defendant must then "show that the earlier conviction was constitutionally infirm" (quoting United States v. Barbour, 393 F.3d 82, 93 (1st Cir. 2004))). Mello cannot make this showing here because the absence of a jury in a juvenile proceeding is not a constitutional infirmity. There is no constitutional right to a jury trial in juvenile proceedings. Bellotti v. Baird, 443 U.S. 622, 635 (1979) ("[J]uveniles are not constitutionally entitled to trial by jury in delinquency adjudications." (citing McKeiver v. Pennsylvania, 403 U.S. 528 (1971))). We therefore do not disturb the district court's scoring of Mello's juvenile adjudications in accordance with U.S.S.G. §4A1.2(d)(2).[10]

---

[10] To the extent that Mello asserts that a defendant's due process rights are violated by scoring any conviction that lacked a jury, even when such procedure was not required in the prior proceeding, we decline to address that issue. It is undeveloped and therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**3. Obstruction of Justice and Acceptance of Responsibility**

Next, Mello presents two interrelated claims of error with respect to the district court's Guidelines calculation: the court's denial of an acceptance-of-responsibility downward adjustment pursuant to U.S.S.G. §3E1.1, and its imposition of an obstruction-of-justice enhancement pursuant to U.S.S.G. §3C1.1. We find no fault with either decision by the district court.

We begin with Mello's challenge to the obstruction-of-justice enhancement, which -- as it was unpreserved below -- we review for plain error. See United States v. Soto-Sanchez, 138 F.4th 81, 92 (1st Cir. 2025) (explaining that unpreserved challenge to obstruction-of-justice enhancement must be reviewed for plain error). We note at the outset that Mello did not address the four-part plain error standard in his opening brief. This failure often constitutes a waiver. See United States v. Rathbun, 98 F.4th 40, 58 (1st Cir. 2024). But even if Mello had addressed our standard of review, his claim would still fail.

A court may apply a two-level enhancement to a defendant's offense level:

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct.

U.S.S.G. §3C1.1. An example of conduct warranting such an enhancement includes "willfully failing to appear, as ordered, for a judicial proceeding." Id. §3C1.1. cmt. n.4(E). Mello does not dispute that his failure to appear was sufficient to support the application of the obstruction enhancement. Rather, he contends that the obstruction-of-justice enhancement should not have been applied because he was already subject to a consecutive sentence based on his § 3146(a)(1) conviction for failing to appear. To enforce both the enhancement and the consecutive sentence would punish him twice for the same conduct, Mello argues. To support this claim, he analogizes to the weapon enhancement under U.S.S.G. §2D1.1(b)(1), which cannot be imposed when a defendant is otherwise convicted for possession of firearm in violation of 18 U.S.C. § 924(c), see U.S.S.G. §2K2.4 cmt. n.4. Mello contends that the sentence in his case is similarly improper.

This argument misunderstands the operation of the applicable Guidelines. When a defendant is convicted of both a failure-to-appear and a substantive offense (with respect to which the defendant failed to appear), the failure-to-appear count and the substantive count(s) are grouped together under U.S.S.G. §3D1.2(c). See U.S.S.G. §§2J1.6 cmt. n.3, 3C1.1. cmt. n.8. The offense level for the group "will be the offense level for the underlying offense increased by the 2-level adjustment specified by [U.S.S.G. §3C1.1], or the offense level for the obstruction

- 26 -

offense, whichever is higher." Id. §3C1.1. cmt. n.8; see id. §2J1.6 cmt. n.3. The court then determines the total punishment for the grouped offenses and allocates that total sentence among the counts of conviction. See id. §2J1.6 cmt. n.3.

This formula is the exact procedure that was implemented by the PSR and adopted by the district court in this case. Here, the offense level for the failure-to-appear count, when adjusted to account for the underlying drug offenses, was calculated by the court to be 15. As this offense level is lower than the offense level for either of the drug counts when increased by the obstruction enhancement -- an offense level of 34 -- the offense level for the grouped counts was calculated by using the base offense level for one of the drug counts. Combined with a criminal history category of II, the group GSR was 168 months to 210 months. This range is the same GSR that Mello would have been subject to if he had not been formally charged with violating § 3146(a)(1) but still failed to appear for trial. The only impact that the § 3146(a)(1) count had on Mello's final sentence is that the district court was required to apportion, at least nominally, the sentence of imprisonment between the grouped counts.

The differential treatment accorded to this scenario and those involving § 924(c) convictions demonstrates why the analogy proposed by Mello is inapt. Unlike § 3146 convictions -- which are grouped with the underlying offense -- § 924(c) convictions

- 27 -

are expressly excluded from application of §§3D1.2-3D.5 because § 924(c) both specifies a mandatory minimum and requires a consecutive sentence. See U.S.S.G. §3D1.1. cmt. n.2. Since a § 924(c) conviction is not subject to the grouping rules described above, the Guidelines prohibit application of the §2D1.2 weapon enhancement to avoid double punishment. See id. §2K2.4 cmt. n.4. Conversely, a § 3146 conviction does not carry a mandatory minimum, and so any double punishment issue that might arise for § 924(c) convictions in the absence of the instruction expressed in §2K2.4 cmt. n.4 is simply not present in this case. It was therefore not plainly erroneous for the district court to calculate Mello's GSR exactly as the Guidelines appear to envision.

Mello's preserved objection to the district court's denial of an acceptance-of-responsibility credit fares no better. Under the Guidelines, the district court may decrease the defendant's offense level by two levels "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. §3E1.1(a). The defendant has the burden of proving by a preponderance of the evidence that this downward adjustment is warranted. United States v. McCarthy, 32 F.4th 59, 65 (1st Cir. 2022). We review the district court's finding of a lack of acceptance for clear error, "accord[ing] substantial deference to its determination that acceptance of responsibility has not been shown." United States v. Langston, 110 F.4th 408, 425 (1st Cir.

2024) (quoting McCarthy, 32 F.4th at 63); see U.S.S.G. §3E1.1 cmt. n.5.

Ordinarily, conduct justifying an obstruction-of-justice enhancement "indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. §3E1.1 cmt. n.4. There may be, however, "extraordinary cases" where application of both adjustments is appropriate. Id.; see United States v. Maguire, 752 F.3d 1, 6 (1st Cir. 2014) (describing circumstances where both a downward adjustment under §3E1.1 and an enhancement for obstruction of justice are appropriate as "hen's-teeth rare"). Mello points to several factors that he claims make his one such a case: his history of having been abused as a child, his mental health struggles, and his pre-trial rehabilitative efforts while residing in a substance use treatment facility for three years prior to his failure to appear.[11] But these facts, taken individually or together, fail to raise to the level of extraordinary circumstances.

---

[11] Mello also posits that his case is extraordinary because the court's denial of the acceptance-of-responsibility adjustment acted as additional punishment for the same conduct that resulted in the obstruction enhancement and a consecutive sentence of six months for his § 3146 conviction. This argument is merely a derivative of the same one addressed and rejected above. Furthermore, even when a defendant pleads guilty, "a defendant has no automatic entitlement to a downward adjustment for acceptance of responsibility." United States v. Hunter, 653 F. App'x 11, 13 (1st Cir. 2016) (unpublished table opinion). It follows that a defendant's failure to receive such credit therefore does not act

- 29 -

The district court found that Mello's obstructive conduct warranted the §3C1.1. enhancement and that Mello had not shown that his case was an extraordinary one justifying the acceptance adjustment. At bottom, Mello laments that the district court overvalued the evidence of his obstructive conduct and undervalued the facts supporting his acceptance of responsibility. But the balancing of factors demonstrating the defendant's contrition (or lack thereof) is an inquiry "uniquely within the discretion of the sentencing court." McCarthy, 32 F.4th at 65. While his past trauma and pre-trial rehabilitative efforts may be relevant to the district court's analysis, see U.S.S.G. §3E1.1 cmt. n.1., these facts are counterbalanced by the heavy weight of Mello's subsequent failure to appear for trial and avoidance of arrest, see Maguire, 752 F.3d at 6 (concluding that defendant's assistance to law enforcement, "his guilty plea, his compliance with the terms of his pretrial release, and his avowals of contrition" were insufficient to "overcome the secondary effect of the warrantable finding that he had obstructed justice"); cf. Langston, 110 F.4th at 425 ("Under our precedent, 'a defendant's failure to comply with conditions of a bond [can] be highly relevant to assessing the sincerity of the defendant's

_____

as additional punishment. See United States v. Rosas, 615 F.3d 1058, 1065 (9th Cir. 2010).

contrition.'" (alteration in original) (quoting United States v. McLaughlin, 378 F.3d 35, 40 (1st Cir. 2004))).

Notably, Mello does not point to any evidence from after his failure to appear for trial and subsequent arrest that shows his sincere remorse. That he ultimately pleaded guilty to all counts does not, as Mello implies, require the downward adjustment, since a defendant who enters a plea agreement is not entitled to the §3E1.1 adjustment as a right. U.S.S.G. §3E1.1 cmt. n.3; see United States v. D'Angelo, 802 F.3d 205, 210 (1st Cir. 2015). While a guilty plea is one factor demonstrating acceptance of responsibility, the sentencing court may also consider "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. §3E1.1 cmt. n.1(H). It is therefore significant that Mello did not plead guilty until after he failed to appear and was once again arrested. See id. Under these circumstances, the district court did not clearly err in denying a downward adjustment for acceptance of responsibility in light of Mello's obstructive conduct. See United States v. Stile, 845 F.3d 425, 432 (1st Cir. 2017) (affirming denial of acceptance-of-responsibility adjustment, even though defendant had pleaded guilty, because defendant "obstructed the government's efforts to prosecute him").

## 4. Departures

Mello asserts that, notwithstanding his below-Guidelines sentence, the district court erred in refusing to also grant a downward departure based on his youth, see U.S.S.G. §5H1.1, or the overrepresentation of his criminal history category given the scoring of his juvenile adjudications, see id. §4A1.3.[12] He argues that scientific research shows that the regions of the brain governing impulse control and judgment are not fully formed until the early to mid-twenties and that such development may be further stunted by neglect and child abuse. Therefore, "youths are less culpable," and Mello, given that he was 22 at the time of the instant offense and that his criminal history consists of only juvenile offenses, should have been entitled to leniency in the form of a downward departure.

Mello does not specify whether he raises this issue as a challenge to the procedural or substantive reasonableness of his sentence. But regardless of "whether the issue is framed as substantive or procedural, we review the district court's 'discretionary refusal to depart' from the GSR for

---

[12] Mello also argues that a departure was warranted based on his mental health struggles pursuant to U.S.S.G. §5H1.3. This argument, however, was never raised below; nor does Mello address the plain error standard of review on appeal. As such, we do not address this ground for departure. Soto-Sanchez, 138 F.4th at 92-93 (holding unpreserved sentencing argument was waived given defendant's failure to address plain error standard on appeal).

'reasonableness.'"[13] <u>United States</u> v. <u>Herman</u>, 848 F.3d 55, 58 (1st Cir. 2017) (quoting <u>United States</u> v. <u>Anonymous Defendant</u>, 629 F.3d 68, 74 (1st Cir. 2010)).  We address each ground for departure in turn.

At the time Mello was sentenced in September 2024, the Guidelines specified that "[a]ge (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the [G]uidelines." U.S.S.G. §5H1.1 (U.S. Sent'g Comm'm 2023).  The district court acknowledged this basis for a departure, explicitly referencing both Mello's age at the time of the offenses and studies concerning male brain development.  The court determined, however, that Mello's age did not "distinguish[] this case from the typical case" while noting that he was in his early twenties at the commission

---

[13] Citing <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 98 (1st Cir. 2005), the government asserts that we lack jurisdiction to review the district court's discretionary denial of a departure.  While decided after <u>Booker</u>, our decision in <u>Kornegay</u> drew this judge-made jurisdictional doctrine from our pre-<u>Booker</u> cases.  <u>See</u> <u>Kornegay</u>, 410 F.3d at 98 (citing <u>United States</u> v. <u>Romolo</u>, 937 F.2d 20, 22 (1st Cir. 1991)).  We have since clarified that limiting appellate jurisdiction to review discretionary departure decisions makes little sense in the advisory Guidelines system.  <u>United States</u> v. <u>Anonymous Defendant</u>, 629 F.3d 68, 73-74 (1st Cir. 2017). Accordingly, essentially "all sentences imposed under the advisory guidelines . . . are open to reasonableness review, including those that entail either a discretionary refusal to depart or a departure whose extent is contested."  <u>Id.</u> at 74.

of the underlying offenses.  There was no error.  Mello was seventeen when he committed his juvenile offenses, twenty-two when he began drug trafficking, and twenty-six when he failed to appear for trial.  Mello was young, but not so young that the sentencing court had to find that this case fell outside the realm of the typical case.

Mello's argument in favor of a departure based on age stumbles over another hurdle: the court, while denying the departure, did consider Mello's age to be relevant to his sentence under § 3553(a).  Recent changes to the Guidelines, although they do not control this case, support the reasonableness of the court's decision to consider age as grounds for a variance but not also for a departure.  The Guidelines were revised to remove most formal grounds for departure, including U.S.S.G. §5H1.1.  See supra note 6.  In deleting these formal departure provisions, the Sentencing Commission noted that their removal would likely be "outcome neutral" as "judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable [G]uideline range as a variance under 18 U.S.C. § 3553(a)."  Sentencing Guidelines for United States Courts, 90 Fed. Reg. 19798, 19856 (May 9, 2025).  We cannot say, in light of these amendments, that it was unreasonable for the court to deny the departure for age

and exclusively consider Mello's age as a ground for a variance. As "[w]e have observed[,] . . . 'a departure is just a variance by another name.'" United States v. Fletcher, 56 F.4th 179, 187 (1st Cir. 2022) (quoting United States v. Santini-Santiago, 846 F.3d 487, 490 (1st Cir. 2017)).

The district court's denial of a departure based on Mello's criminal history was also reasonable. Under §4A1.3(b)(1), "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. §4A1.3(b)(1). The district court found that such over-representation was not present here. The court reviewed Mello's juvenile offenses, noting his vandalism of a car, his violation of probation, his charges of burglary and criminal trespass, and the length of his subsequent periods of detention. It was significant to the court that Mello began drug trafficking less than four years after he had been discharged from juvenile detention. Considering that his prior detentions did not deter his commission of the instant offenses, the court found that a departure based on criminal history was not warranted. Such a reasoned explanation for the denial of a departure carries "no hint of unreasonableness." Maguire, 752 F.3d at 7.

## B. Substantive Reasonableness

We turn finally to Mello's claim that the 115-month sentence of imprisonment for his drug offenses was substantively unreasonable.  Acknowledging that the district court considered his personal characteristics when varying downward from the GSR, Mello disputes the extent of that variance and insists that the court undervalued his background and age.  We disagree.

"[T]hat [a] sentencing court chose not to attach to certain of the mitigating factors the significance that the [defendant] thinks they deserved does not make the sentence unreasonable."  United States v. Sansone, 90 F.4th 1, 10 (1st Cir. 2024) (second and third alterations in original) (quoting Clogston, 662 F.3d at 593).  Given that "the weighting of [the section 3553(a)] factors is largely within the [district] court's informed discretion," Clogston, 662 F.3d at 593, "[w]e are bound to 'accord significant deference'" to the district court's "informed determination that the [S]ection 3553(a) factors justify the sentence imposed," United States v. Rivera-Morales, 961 F.3d 1, 21 (1st Cir. 2020).  Moreover, Mello "faces an even steeper climb than most defendants . . . because '[i]t is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness.'"  Herman, 848 F.3d at 58-59 (second alteration in original) (quoting United States v. King, 741 F.3d 305, 310 (1st Cir. 2014)).

The district court explained its reasoning for imposing the sentence that it did and explicitly stated that it had considered the § 3553(a) factors. The court addressed Mello's "personal history and characteristics," noting that Mello had suffered emotional trauma and abuse as a child, had been diagnosed with a variety of mental health conditions, and has substance abuse issues. The court also discussed in detail Mello's upbringing, his young age at the time of the offense, his lack of education, his employment history, and his decision to plead guilty. These facts, the court explained, supported a downward variance. The district court also reasoned, however, that a lengthy sentence was appropriate given the seriousness of the offenses, Mello's choice to continue to sell drugs after A.K.'s death, his failure to appear for trial, the quantity of drugs for which Mello was accountable, the deterrent effect on both Mello and others that a substantial sentence would have, and the victim impact statement from A.K.'s husband. In discussing and balancing these numerous mitigating and aggravating factors, the court adequately explained its sentencing rationale. See United States v. De Jesús-Torres, 64 F.4th 33, 42 (1st Cir. 2023) (finding sentence substantively reasonable where court weighed defendant's "age, mental health condition, mental disability, first time offender status, and his allocution" against the serious nature of his crime); United States v. Pacheco-Martinez, 791 F.3d 171, 180 (1st Cir. 2015) (affirming

sentence as reasonable where district court "explicitly considered [defendant's] age" but also "considered other relevant factors" that cut against the mitigating factor of his age).

Mello's sentence is also defensible. In arguing that an even lower sentence was warranted, he emphasizes that 115 months for the drug charges alone is almost double the length of sentences imposed for drug trafficking offenses in 2023.[14] However, a claim of sentencing disparity requires comparison of "apples to apples." United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015). "And, if 'material differences between the defendant and the proposed comparator suffice to explain the divergence,' a sentencing disparity claim is unlikely to prevail." United States v. Rosario, 143 F.4th 41, 47 (quoting Demers, 842 F.3d at 15). We agree with the government that Mello has failed to provide such a like-kind comparator. The U.S. Sentencing Commission data to which

_____

[14] That the court did not explicitly reference these national sentencing statistics is of little moment in light of the court's statement that it considered all of the § 3553(a) factors and thus endeavored to reach a sentence that avoided unwarranted sentencing disparities. See Clogston, 662 F.3d at 592 ("Even though the district court did not specifically mention disparity, it stated that it had considered all of the [S]ection 3553(a) factors. Such a statement 'is entitled to some weight.'" (quoting United States v. Dávila-González, 595 F.3d 42, 49 (1st Cir. 2010))). The failure to mention all of Mello's arguments merely suggests that "they were unconvincing, not ignored." United States v. Ortiz-Pérez, 30 F.4th 107, 112 (1st Cir. 2022) (quoting Díaz-Lugo, 963 F.3d at 152); see also Rivera-Morales, 961 F.3d at 19 (explaining that "a sentencing court is under no obligation . . . to address every argument that a defendant advances in support of his preferred sentence").

Mello points does not include any of the information about the defendants and the crimes that we have deemed relevant to determining if a comparator is similarly situated, such as the criminal histories of the defendants, the nature of the offenses, or the amounts of drugs involved. See id. at 48-49 (concluding that the defendant failed to provide "necessary information to determine whether he and his co-defendants were identically situated," as the defendant failed to provide "his proposed comparators' criminal histories, the specific circumstances of their plea agreements, or the particularities of their crime-spree conduct"). Without this context, we cannot say that Mello's higher sentence is "unwarranted." See United States v. Jiménez, 946 F.3d 8, 16 (1st Cir. 2019) (concluding that defendant "can point to no relevant disparity that might render her sentence substantively unreasonable" because the defendant "has not offered evidence that would show that her circumstances are sufficiently similar to the national median fraud defendant to create a meaningful point of comparison"); United States v. Ayala-Landor, 994 F.3d 73, 77 (1st Cir. 2021) (rejecting defendant's sentencing disparity argument because, even though defendant's sentence was higher than national sentence statistics, that "does not mean that a modest variance was 'unwarranted' in [the defendant's] case, given his criminal history and characteristics").

The district court, in varying downward from the Guidelines, unquestionably placed significant weight on Mello's personal characteristics. That the court did not vary to the extent that Mello believes he deserves does not make the sentence unreasonable. The court reasonably balanced Mello's youth and traumatic childhood with, inter alia, the high volume of drugs Mello trafficked and the likelihood that he would recidivate. In short, we hold that Mello's sentence both rests on a plausible sentencing rationale and reflects a defensible result.

## III. Conclusion

For the reasons described above, Mello's sentence is **affirmed**.